We will hear argument first this morning in Case 24-568, Bost v. the Illinois State Board of Elections. Mr. Clement. Mr. Chief Justice, and may it please the Court, Illinois counts mail-in ballots received up to two weeks after election day. Petitioners contend that under controlling federal law, that is two weeks too long. As a result, if the petitioner's merits theory is credited, which it must be for evaluating standing, then Illinois is counting unlawful ballots, those unlawful ballots could cost Congressman Bost the election or at least reduce his margin of victory, and he has to pay his campaign staff for two extra weeks. All of that means that Congressman Bost has standing three times over. The Court below lost sight of that straightforward conclusion only by misreading this Court's and misperceiving candidates who pour untold time and treasure into the election and are the ones whose names are actually on the ballot as mere bystanders with a generalized grievance. That decision is not only wrong, but dangerous. It needlessly injects federal courts into the role of political prognosticators. It risks denying judicial access to minor party candidates, and it shuffles election disputes into the closest races and the worst possible contexts, election disputes after the election where federal courts are in the uncomfortable position of having to pick the political winners. There is a better way, and it simply requires acknowledging that candidates have a unique, concrete and particularized interest in the rules of the electoral road, especially those that address which ballots are going to be counted and when. At a bare minimum, a longer campaign is a more expensive campaign, and that classic pocketbook injury is sufficient to give Congressman Bost standing. There is no need to make the standing inquiry here any more complicated than that. I welcome the Court's questions. Mr. Clement, how do we know that Kishner will suffer a risk of competitive harm? So in some respects, we know that from the very fact that he is a candidate in the election. I mean, obviously, he's put that in a declaration as well, but I think this is something where every candidate cares very deeply and uniquely about the outcome of the election, but also their vote tally and the margin of victory or the margin of defeat. And this idea that, like, all a candidate can care about is the ultimate win or loss, I just don't think that maps on to the way elections actually operate or people think about them. Well, I think you could argue that he will actually benefit from the additional time. So I mean, someone has to benefit or there wouldn't be a risk of competitive harm. I suppose any time the government changes the rules for any highly regulated activity, it may be that some of the people that are affected by the new regulations are actually going to be better off. They may be better off, better able to sort of incur the costs or they may be better able to take advantage of that additional time. Here, Congressman Bost has alleged that, no, this is going to hurt his sort of margin for victory. But I also think as a general matter, I'm not even sure you need to get to that level, which is to say, if this were just a simple regulated industry, if the SEC promulgated new rules for registered broker-dealers, you'd expect the broker-dealers, some of them, to come and sue about those new rules. I think you wouldn't be that worried that broker-dealers were coming in and actually suing for rules that help them. The market sort of shifts and takes care of that. That's the point, though, that this regulation is not of a broker-dealer. It's not of the candidate. It's of voters. So it's not a direct regulation. But going back to your margin of victory, in the case where we decided that a campaign ad had standing, in that case, there were affidavits that said, these ads increase the amount of revenue we receive or can decrease it. So there was an affidavit that said that. Here, you don't even say that the margin of error is going to affect. You don't have anybody saying anything close to that. You're just saying the margin of error could have a reflection on me. That's a generalized statement with no support. So two things, Your Honor. First, just on the first point, if the new broker-dealer regulations from the SEC regulated the terms at which the customers could deal with the broker-dealers, I think the broker-dealers would still have standing. But this is not how they're dealing with the candidates. They're still voting for the candidate. They're not being deprived of their right to get their voters to vote. So I'm not sure the analogy doesn't work for you, Mr. Clement. But let's go back to my point that I'm not sure that someone who says to the court below that his, quote, injury is not based on the risk of losing the election, seems to me that he's foregone that argument here, as he did below, and that the question becomes whether this margin of victory issue is enough. So two things, Your Honor. One, as we point out in our reply brief, and I would urge you to read the Seventh Circuit briefing on this, the statement that my friend on the other side says is where we waive this electoral outcome argument was simply responding to their argument that pocketbook injuries don't matter if, in fact, you can't show that there is this electoral outcome injury. And what we said in response, and what we say in our reply brief here, and remains correct and waives nothing, is that's actually not right. The pocketbook injury is separate from any electoral outcome. So there's no waiver of any of this. There was a declaration here. The declaration does say that we, that Congressman Boss risks losing the election, but it also then says, but it's certainly going to affect the margin of victory. And he also alleges in his declaration that that margin of victory is not just an abstract injury, but that translates rather directly into reputational injuries and financial injuries. And I think that corresponds with the general sort of common sense of the matter. If you ask candidates, would you like to win this election by 60% of the vote or 51% of the vote? I think 100% of the candidates are going to say, I'll take the 60%. Yeah, but that's not how we ordinarily think about harm. And harm is what you need in order to establish standing, not preference for 60% or 59% or whatever. And so what I guess I'm a little concerned about in your argument is the idea that a candidate who wins and who wins by some margin is harmed by a regulation of this nature because of the potential decrease in his margin of victory. I don't understand the harm that necessarily comes from that. So if you start with the premise that every candidate would prefer to win 60% rather than 51% and then you challenge... Why do we start with preference? That's what I'm saying, that the relevant metric for standing is harm. So yes, fine, you might be disappointed, but that's usually not what we look at when we're determining whether or not someone is actually harmed. Well, I would say that if a law improperly denies somebody their preference, that is a harm. But in all events, I don't think you need to make it that abstract. If the abstraction is what's bothering you, he alleges in his declaration that that is accompanied by reputational and financial harms as well. Isn't that speculative? I mean, couldn't we also speculate that a candidate who decreases the margin of error or, excuse me, the margin of victory, who wins by a smaller amount, people would actually want to contribute more the next time as opposed to them not having contributors? I don't necessarily see a financial harm that comes from a smaller margin of victory. Well, on this, I mean, you know, I think this is the kind of issue that at this stage of the case, where you have a complaint and you have a declaration, you haven't had any evidence. If the other side wants to come in and put on an expert that says, actually, Congressman Bost, who's run successfully in Illinois, like a dozen times, doesn't know what he's talking about, actually, I'm saying it's your burden. You are the petitioner and you have to establish standing. You're the plaintiff. So you have to show that you have a non-speculative risk of harm here. And I just don't understand how saying, well, I would prefer to win by more actually counts, especially when you're winning by, you know, more or less is sort of speculative in this context. Well, with respect, I think if you're going to allow people to challenge election rules at the beginning of the election, which I actually think is something that the standing disputes litigated at the worst possible times, you're going to have to allow some room for a little bit of speculation. I mean, because the election hasn't happened yet. But the way that this court's cases have generally dealt with that is you have to show that there's a substantial risk of something. And here there's no question in my mind that at this stage of the litigation, between the allegations and the declarations, he's done enough for the motion to dismiss stage. Again, you know, we all know that standing law has to be sort of addressed at the level of substantiality for every stage of the litigation. And so if they want to continue to contest this, I suppose at the summary judgment stage we could have competing experts on some of this stuff. But frankly, I think that is a pretty good advertisement for a broader, simpler rule that simply says candidates have standing to challenge the rules that govern. If it were after the election, how would that play out? So in other words, if the litigation over issues like this were funneled to post-election? Well, I mean, there's a couple of ways to think about that. One analytical way to think about that is, I would say, no matter what the margin of victory is, if there are ballots that under Congressman Bost's theory were illegally counted, I think he would have standing to bring the challenge. Now, the courts might want to apply in the post-election context. What's the remedy? Does the court there and this is, I think, blends into your concern about post-election, but I just want to play it out. So let's say the losing candidate sues challenging this rule and let's say the court finds it post-election, finds it illegal. And we faced this in 2020 in some of our many cases pre-election. What's the remedy? Well, I throw out those votes because if you do, some of those voters might say, oh, I actually would have voted earlier if I had known. I'm just trying to figure out how that would play out. So I think that would be the right remedy. And I think that's kind of a nightmare scenario for exactly the reason that you point out. And I don't think there's any reason for the standing rules to basically say that you have to decide all these issues in those nightmare scenarios or even in the very closest districts. And the point I was trying to make is, like, if you think about this case proceeding past the pleading standard, the idea that you would have like competing experts come in and say, you know, Congressman Bost is kind of a lousy candidate, so this one's going to be pretty close. And that would be my expert because I'd have to show that the election is close in order to have standing. And then they'd come in and their expert would say, no, Congressman Bost is the best candidate there's ever been. He's going to win this thing in a landslide. Would you agree to a rule like this one, which sort of makes this question of do you have to show you would win or do you have to show margin of victory a little bit irrelevant that what you have to show, you have to show something. It's not enough to just walk in and say, hi, I'm a candidate and I'm suing. But what you have to show is some kind of substantial risk or substantial likelihood, whatever the phrase may be from our standing doctrine, that the new rule puts you at an electoral disadvantage relative to the old rule so that, you know, if the new rule has says more mail in ballots, then you just have to plead that that's a kind of rule that puts you to an electoral disadvantage and say something, not a lot, but something to suggest that that's right. So I could live with that rule. I don't know that it's the ideal rule. I mean, I'm not coming in here asking for a broad rule because I'd like to win this case in the hardest possible way. I'm asking for that because I actually see advantages to it, namely that even under your view, you still, in theory, would have at the summary judgment stage this like debate in Article three courts about whether late arriving ballots help Republican candidates or Democratic candidates. And that makes me sufficiently uncomfortable that I actually would prefer a rule that says, no, Congressman Boss is coming in and he's saying there are going to be unlawful votes cast and there'll be ballots with his name on it in his election. That's enough. We're done. None of your rule really does just take out the injury requirements entirely. It just says you should assume that if a candidate is there before the court, the candidate has good reasons for being there before the court. And for the most part, I think we have rejected that view of standing. I mean, for example, we said there's no such thing as doctor standing just a couple of years ago. So to hear it seems quite inconsistent with our standing law to say, oh, we just have like an automatic rule for candidate standing. On the other hand, I'm sort of in sympathy with the view that this bar should not be all that high and that the bar shouldn't have to like you shouldn't have to say here are the polls that show I could lose as a result of this rule. It's like all you have to do is come in and say why it is that the rule puts you at a disadvantage relative to what's come before. So, Justice Kagan, I don't think that much separates us. And so I don't want to sort of die on any particular hill here. The reason that I'm hedging a little bit, I'll say two things in response. One is I don't think it's we're saying get rid of the standing. I mean, the injury in fact, we're just saying unlawful ballots being counted in your election is an injury in fact. It's a little abstract. Sure. But it is an injury in fact. And then everything else follows. And then you don't even have to get into that. What I still think is an uncomfortable prospect of competing expert affidavits where one party says that actually late late breaking votes can actually be good for Congressman Boss because people like candidates with a B in their name or something. And then the other side says, no, they're actually good for the Republicans. Mr. Clemento, if you could just answer whether you could satisfy Justice Kagan's standard, I'd be grateful whether you and it doesn't require a competitive, as I understand the question, it doesn't require a competitive disadvantage. It just says compared to the law, what I understand the law to have been, I'm at a disadvantage. Yes, we can satisfy that. Can you spin that out? Sure. I mean, we can satisfy it in sort of two ways. I mean, one, Congressman Boston, his declaration has made clear that he thinks that this rule will hurt his margin for victory. And then the second thing he said and maybe said this, frankly, more clearly is because he's you know, we have kind of the unique benefit here of a candidate who was a candidate under the old rules. And he has said that this change in the rules has increased the cost of running his campaign. So on both those two kind of classic injuries, I think the declarations here are sufficient. Obviously, we're just at the motion to dismiss stage, so there could be more, but I think they are satisfied. Mr. Clement, when you say that these two classic injuries, how does how, if at all, does TransUnion affect this? Do you have to show that there's some sort of history and tradition that this is the kind of injury, either the vote margin or the risk of electoral loss that counts as a cognizable injury? So two thoughts on that. I mean, one, if we have to, then I think the pocketbook injury just makes it easy because that's classic. Go back, Blackacre, Whiteacre, you know, whatever. That's the classic old school injury. The second thing I would say, though, is I do think there's some artificiality in some of these contexts to force everything to be run through the pocketbook injury. I mean, that Congressman Bostie is injured in the pocketbook, but that's because he's a candidate in election with a ballot with his name on it. And I think if you go back to the relevant history here, I don't know if 133 years counts, but I take you back to McPherson v. Blackacre. And that was a case brought by presidential electors challenging Michigan's change of the rules for the presidential electors. Michigan went from statewide to a district by district way of having presidential electors. This court thought a lot about justiciability in that opinion, didn't bat an eye about standing. Of course, the presidential electors are the right people to challenge a change in the rules for presidential electors. And then I would also take the court back, not ancient history, but Crawford against Indiana and the voter ID case. There was a question about the standing of the Indiana Democratic Party. Justice Stevens in footnote seven dispatches it in two sentences. Of course, the Indiana Democratic Party has standing to challenge a voter ID law that they think is going to be bad for Democratic candidates. And Justice Souter agreed with that. So there's at least five votes for the proposition that and his footnote was just as short. It's just common sense that in these contexts, the candidates who are the ones, as Judge Oldham said, in his opinion, they take time off from the elections. Their names are on the ballot. Thank you, counsel. You've answered a lot of hypothesis. I just want to make sure I understand what your opening submission is. It is high. I'm a candidate. These rules apply to me and I'm suing. Right. And if that's not enough for you, but that is the opening pitch, right, that he's the one that's affected by the well, that's the question, I guess, whether is it is it enough to simply say, I am the candidate and I'm suing. So I want you to believe that it is. If it's not enough, I have my two fallback arguments. But I think the reason it is enough is because in every one of these cases, I mean, you can run it one step further, which is what I tried to do with Justice Kagan. And you can say it's not just that I'm a candidate, I'm a candidate here and I have an injuring fact, which is I think they're going to be unlawful ballots counted in my campaign. OK, Justice Thomas, when we had Lujan some years ago, this footnote seven made a similar point. Are you making the same point that procedural right doesn't have the same requirement for immediacy or addressability? I think it's a related point. I don't know that I would draw quite the same sort of procedural substantive distinction to me. I sort of think and obviously Justice Sotomayor and I had a colloquy about the limits of this, but I sort of think there is this kind of common sense principle that if you are in a highly regulated enterprise and the government changes the regulations and you think it hurts you, like you go in and you say like even if it's something that seems trivial to an outsider, if a broker dealer now has to do everything on blue paper and it's going to change the way they operate, I think they ought to have standing to say it's arbitrary and capricious for you to say everything has to be on blue paper. So and I don't know why there would be a special rule that makes it more difficult in the electoral context. I mean, you certainly don't have to worry about generalized grievances here when there are only going to be a handful of candidates in a particular election. Justice Alito, you have several arguments and I don't want to get into most of them right now, but on the issue of competitive injury, it's not clear to me why you couldn't have done a lot better than you did in your complaint and alleged what I think a lot of people believe to be true, which is that loosening the rules for counting votes like this generally hurts Republican candidates, generally helps Democratic candidates. Why didn't you pursue that? Why didn't you try to do something with that? So Justice Alito, in some respects, the answer is when you plead a case in district court, you don't expect to be in the Supreme Court defending every pleading that was sufficient understanding. And we certainly thought when we pled this, pleading pocketbook injury, competitive injury, albeit briefly, and that we're the candidate, why is this so difficult? And relying on cases like McPherson, we didn't really think we would have to sort of plead more. And even when the complaint was challenged, we sort of thought that we'd done enough. And then all I can say in response to that is, of course, we could say that and we've said it all in our briefs in front of this court. So we could have said more. But boy, that's a weird inquiry to then think it's going to stick around in the case. It's a thing. It's like if you think about this only as well, this is just what you need to plead. And then we're done with standing forever. These cases seem cleaner. But that issue sticks. OK, I understand. One final question. And I should have researched this myself beforehand. When was this new rule enacted and do we know what the partisan breakdown in on voting for the rule was? And could we take judicial notice of that? So I this rule was 2005 and I don't think there is robust data that would allow you to you could take judicial notice of this. And thank you. You know, we send the reply. It's like, you know, my friend tries to make something of one data point for one county in one election. We don't even know what the kind of comparator is. So I got you. This is Sotomayor. Mr. Clement, we now have a whole body of law developing on the fact that we're not going to give relief to more than one plaintiff at a time so that the relief should be tailored to the needs of the plaintiff at issue. Assume that you have a district and there are some of like this, maybe not your clients, but that goes to the failure of pleading in this case, that there are some districts where the Republican registered parties are 98 percent, the Democrats are two. Your rule would say that that candidate who has not just an insubstantial, but a statistically almost impossible chance of winning, of losing, that that candidate can come in and seek a change of that rule. Correct. That's your position. That's correct. And I mean, I think the absurdity of that. Generally, we have said that suits should be brought by people for whom the harm is concrete in some meaningful way. Losing, let's say, by one percent more or less can't be meaningful on any scale. So as Justice Alito said, there are a lot more things you could have said, you could have even said, instead of saying I risk injury if untimely and illegal ballots caused me to lose my election, you didn't even say I risk substantial injury, which is our standard, substantial harm. So you didn't even track our legal language. You didn't put in any facts, as Justice Alito pointed out, about what the turnout is, what your district is like, nothing from which any plausible argument could be drawn. I'm also not sure what the battle of the experts is about. This is on pleadings. We have to give your expert, absent some spatial deficiency, take the allegations in your favor. So I'm not sure where this battle of the experts is going to come. So I'll take the last part first. The battle of the expert comes in summary judgment. Just because we have sufficient allegations doesn't mean we're done. And all of the things that you talked about on a motion to dismiss. No, this case is. But if we win because we allege all those details about Republicans and Democrats and voting patterns, that doesn't go away in the case that's still there at the summary judgment stage. And that's where the battle of the experts are. But as to the two percent voter, I'm going to stand with the two percent candidate. And, you know, I stand in lock shoulder with the Socialist Workers Party and however many percentage votes John Anderson got. And they were able to bedfellows you're taking. But I'm delighted to have those bedfellows because that's the way we think about elections in this country. We don't think just give me the bottom line result. Give me the binary result. Winner or loser. Mr. Clement, that our that our case law and our standing law require some form of substantial harm that can be articulated and shown. And what you're talking about is a desire to implement the law with a generalized grievance because it doesn't really particularly harm you. So for the Socialist Worker Party, the difference between two percent and two point five percent might be not the difference between getting some like on the ballot the next time or federal. It might be the difference between getting taken seriously and the next election getting to three percent or five percent. I mean, you know, eventually we got rid of the Whig Party. It takes a long time. But those small differences do make a difference. And then the second thing I would say is just as a general matter, this is not a generalized grievance. This is almost the opposite. Like when you have voters here standing like in a case like Lance, you worry about generalized grievance because everybody's a voter just like everybody's a taxpayer. But when you're talking about whether candidates have standing like you've already limited the universe like a handful of people. And so just like you limit the universe, there aren't that many broker dealers in the world. So you're not going to flood the courthouse with those suits. And you've already limited this to people that have a much more particular interest in the issues. Justice Kagan. So I'm curious, Mr. Clement, and I am going to actually limit this to Democrats and Republicans for purposes of this question. I mean, usually in a lot of these suits, it's the parties that say, right, the RNC sues or the DNC sues. And as Justice Alito suggested, it's usually fairly predictable what rules the RNC is going to sue on and what rules the DNC is going to sue on. And both have their favorite rules and their disfavored rules. And and usually we don't think about standing in that area. But I'm wondering whether you think like I would think that the same standard should basically apply that whether we think about it or not, what we're really asking is, is this the kind of rule that is likely to put your candidate at a disadvantage relative to where he was before? And I mean, do you think that there's some separate inquiry for individuals, for candidates as opposed to parties when they sue for these rules? No, I mean, if anything, I think the candidates are more obvious, but I don't think it's a radically different proposition. But here's what I do want to say. Usually in these cases, when the party sues, they often couple themselves with a candidate or voters. And one of the things that I think is particularly problematic is you said it yourself, like there are certain of these rules that the Democrats don't like and certain these rules. No, the Republicans don't like. Well, the rules that the Democrats don't like tend to operate negatively directly on voters. And so when the when the Democrats come in, they can marry up with a couple of voters and the court can say the voters have standing. So we're done. We don't even have to think about the party or the candidate. The Republicans in a lot of these cases are challenging rules that allow you to keep counting ballots forever, keep the voting place. But that doesn't prevent the Republicans from getting into court and making their claim. It never has. You know, the RNC challenges most of these kinds of rules. And as far as I know, nobody has ever kicked it out of court on standing grounds. I don't know if that's true or not, but it's a lot harder for the Republicans in some of these contexts because they can't just marry themselves up with a voter. The other thing I would say is we actually don't have that much history on any of this because until relatively recently, everybody kind of just thought it was the most obvious thing in the world that Crawford. I mean, like I said, Justice even spent two sentences saying, of course, the Indiana Democrats don't like voter ID laws, so they have standing. But it wasn't like a here's the injury. In fact, here's redress ability. Here's traceability. And I think, you know, in a state of recent cases, some of them in the post-election, some of them pre-election, like all of a sudden standing's gotten really complicated and created a circuit split. I'm here to urge let's return to simplicity. Let's return to McPherson v. Blacker, your candidate, your party. Of course, you have standing. Thank you. Justice Gorsuch, I want to return to your colloquy with Justice Sotomayor for a minute, because it does seem to me that whatever is required, it can't be a showing that you would have won or lost the election as the candidate. You pointed to Illinois socialist workers case. Boy, they had zero chance of winning the election. Zero chance. So that can't be the injury that's required, it seems to me. Likewise, FEC versus Davis funding. How much can your opponent get versus how much you can spend? No allegation that the outcome would have been different or a number of margin of victory would have been different. We didn't require anything like that in those kinds of cases. Thoughts? I mean, I certainly agree that you didn't require that. I think there are multiple reasons for doing that. I think ultimately it comes down to the common sense intuition that, of course, the candidate has the standing to challenge the rules that provide the framework for the election. I mean, I'll add to your list of cases. But in the Ted Cruz for Senate case, this court went out of its way to say he probably could have brought this as a prospective challenge. You didn't have to wait until after the election and the money was like ten thousand dollars short. So this court, I think, has always said like this is pretty straightforward. And I think there's another good practical reason just to put on the table, which is it's almost a little cruel to make candidates make allegations that are going to be used against them in the campaign. And if Congressman Bost has to come in and say, you know, there's a material chance I'm going to lose this election. And similarly, like government contracting cases, I think of, and as you point out, administrative cases, procedural, you change the rules in government contracting. I don't know whether that fellow is going to win or lose the bid, but you're changing the rules of the game on him. We find standing in those cases all the time. You do find standing in those cases all the time. If you're sort of treated poorly by the rules of the road, you don't have to show that you'll win the contract. You don't have to show that you'll get into the law school of your choice. And I'd add, again, one more to that, which is, you know, we have all these cases where voters have standing. Nobody says that the voter has to come in and say, I'm going to cast a decisive ballot. On the other hand, let's suppose that the change in regulation was instead of ballots on white paper, they have to be on cream paper. Then it's harder to see an injury. Right. So what do we do about that? So my recommendation to you on that is to realize, ah, that's a theoretical problem, but we're not going to have to lose a lot of sleep over that because nobody will ever bring this. Nobody will bring that challenge. And I think if you go, I don't need to tell you that if you go through the federal regulations, there are lots of silly provisions in there that have never been challenged. But somebody at standing. Well, I'd be happy to go through those with you some day, Mr. Clement, but thank you. This cabinet, I think your answers and colloquy with the chief justice and Justice Gorsuch reveal that you're considering this case in the bucket, that the candidates are objects in essence of the regulation. Is that right? And thus, we've said repeatedly that when you're the object of the regulation, you don't need to say much more than you're the object of the regulation. And we've said in cases like the fuel producers last year that the schools and peers, the broadcasting network and CBS, none of those were actually directly regulated. But we still said, in essence, they were the object. Is that is that the analogy that you're using in your answer to the chief? It is, except I might add one word just to avoid a quibble, which is I think they're the objects of the regulatory regime. Like, I think there's a fair argument, and I think Justice Sotomayor sort of baked it into one of her questions that the object of the ballot deadline might be thought of as being the voter who gets the extra 14 days and not the candidate. So it's not that the candidate is the direct object, not the only object, not the only. But probably, you know, you look at it and say they're the direct object. I'll say it. But I do kind of think they're an object. It might help you with some people and not with other people. Yeah, but what I'm making is the fuel producers and the car makers last year. Yeah, obviously. But I'm making a slightly different point, which is I think they are the object of the whole regulatory regime and they regulate some other people incidentally. But it's all really about the electoral process and who's going to win the election and what their vote total is going to be. And again, like Illinois doesn't just certify a winner. They after the 14 days, they certify the vote total. So they care about those late arriving ballots. We care about those late arriving ballots. We think they're unlawful ballots right there. I think that's enough of an injury. Then you're you've made a strong case that we need to decide this connected to the real world of how elections actually operate in some theoretical way. So on your monetary injury point, can you kind of play out how a campaign operates and in how the monetary injury is going to come to pass in a situation with this particular regulation? Sure. And what I would say is in some ways, it's you know, you don't have to have any political sophistication. It's just if the if if the campaign is going to be two weeks longer, you got to keep the campaign staff together for two weeks longer and that's going to be more expensive. And, you know, I think it's telling that what that what you'd be paying for and using your volunteer resources for in that last two weeks is the the the the ballot monitoring and the rest and the poll watching as they count these late arriving ballots. And, you know, no less an authority than the League of Women Voters at page 20 of their amicus brief says it would be political malpractice not to do this. So they're real expenses and they're essentially completely reasonable to use kind of like the formulation and clapper. But one other kind of practical point I want to make is the distortion of this kind of thing starts much earlier because, you know, you don't just say, well, oh, I didn't occur to me that there'd be late arriving ballots. So now in the last two weeks, I have to spend some money. If the election ends at Election Day, you're going to spend your money throughout the process differently. You're going to spend less money at the margins. You can spend less money directed at likely mail in voters. You're going to spend a little more money at the margin on your voters who you think are actually going to go to the polls. And the analogy I was thinking of, it's like, you know, if you have like a mile race instead of a half mile race, that doesn't just change the last half mile. It changes the way you run the first half mile. So these election regulations, all of them have, you know, this one has the most direct effect possible because it's like an election that runs an extra two weeks is going to cost more than one that ends earlier. But I think almost all of these end up having pocketbook injuries. And you could trace it all to the pocketbook injury. But I think it's a little artificial because the reason the candidate has a pocketbook injury is because he's a candidate or she's a candidate. Thank you, Justice Barrett. So you make a lot of practical arguments that I think have force. What do you think, what effect, if any, do you think that adopting your theory would have in other areas of standing law? Because we've been pretty careful about procedural injury. You know, an excellent lawyer who argued transunion convinced us to do that. What do you think this, you're asking for something Justice Kagan points out. We don't fashion bespoke rules for standing in particular context. So what spillover effects would we be worried about in writing an opinion in your favor if you win? So I don't think we're asking for a bespoke rule. I think, you know, obviously the parties fight about this in the brief. But I think what we're asking for is the application of the ordinary standing rules that would be second nature in the context of a regulatory, a regulated industry to just apply in the electoral context in the same way. And, you know, you don't like when a company is like in a particular area of regulation and the regulations change, you know, you don't even think hard that, of course, they have a basis to challenge the change of the rules that they're going to be operating mostly because of money. I mean, Diamond Alternative, it was a topic book. But even if it's just massive inconvenience and it's like doesn't translate, I mean, you know, I think like and you can imagine a situation where like the SEC forces broker dealers to shut their doors at four o'clock. It might, you know, like it's anybody's guess whether they're going to save more in wagers and they're going to lose for the people that they send home early than they're going to make in terms of additional customers that come in in the last hour of the day. I don't think you need affidavits on that. You'd say, look, we've been operating our brokerage this way for 100 years and we close at five. And now the heavy thumb of the government's coming in and saying we have to close at four. I don't I'm sure you're right that you could translate that into a pocketbook injury, but I don't think you've ever had to. And I don't think we're asking for anything different here. Now, like if you're worried about that, there are obviously off ramps to rule more narrowly. But I do think the one that is going to be the simplest rule in the long run that is going to eliminate the circuit split between the Eighth Circuit and the Seventh Circuit is to say candidates have standing to challenge the rules of the electoral road. It really is kind of that simple. Justice Jackson, so your broadest theory, the one that you just articulated, does really seem to be motivated by the idea that the candidates are the object in the way that Justice Kavanaugh explored with you. And I guess I guess I wonder if the response or the reply to that is really when you're talking about an election, it's not the candidates who are the object. It is the voters that really what an election is, is the opportunity for the people to decide who are going to govern them. And so in that context, one could argue that the voters would be able to make the same kind of grievance that you say is particular to the candidate here. Right. You say your grievance is that unlawful balance are being filed in this election. And I wonder why that's particularized to the candidate when, on my theory, the election is really about the voters and voters could make that same argument. And why shouldn't they be able to? And if they could, haven't we undermined your idea that this is particularized to candidates in the way that you are articulating? So what I would say is there are already under your current doctrine, lots of ways for voters to sit. And I don't actually know if Illinois decides we're going to reverse this and we're going to close all the polls early and we're going to get rid of mail in voting. I think any voter who comes in with a declaration says, I want to vote by mail. I voted. That's a different hypothetical. What I'd like to do is focus on your standing argument, which we've said you have to have a particularized grievance, not a generalized grievance. And so my question is, why isn't unlawful ballots are being counted in this election, a generalized grievance? Well, can I try to answer it this way, which is to say, just because a lot of people share a concern doesn't mean somebody who is specifically gored by that concern is raising a generalized grievance, right? But isn't the function of identifying who is specifically gored the harm requirement? Isn't the function of making a candidate say, with all of these extra unlawful ballots counted, I'm at risk of losing. That's what gives him the particular harm that then, I would argue, would entitle him to bring a suit as opposed to the generalized grievance of there's an unlawful thing happening with respect to this activity. And that's why it makes sense. Your second theory, to me, makes perfect sense. I'm not saying he wins. I'm not looking at the record. I'm just saying in terms of a theory of why a candidate could say I'm harmed, it's like the sort of clapper idea that there's a risk of injury to me in a real way. And I'm showing you where that is. To me, that doesn't exist in the first theory, in the world where you're just saying there's an unlawful conduct going on. That does not identify or particularize him. Can I can I direct you to the third theory, the pocketbook theory? In a context, assuming that the injury of a potential election defeat, which I see as a real injury, assuming that's not imminent, I don't understand why additional polling costs isn't a self-inflicted harm. So if you take Justice Sotomayor's example, where you have a candidate who has a 98 percent chance of winning based on everything we know, based on all the polls, whatever else, if he decides that he's going to spend money for the two extra weeks of, you know, counting, I don't understand why that's not on him. There's really no risk of harm to him to have that counting happen. And we've talked about self-inflicted injuries in Clapper, for example, as not being sufficient. So I'd like to just briefly talk about the first point and then get to the third theory. Just on the first point, I still say, you know, harm, injury. Yes, we think we've identified a specific injury that that visits on the candidates specifically. The fact that everybody cares about the votes being accurate. I mean, I'd like to think everybody cares about the environment, but we let the person who's directly downstream from the pollution. We say they're the ones that have standing to bring the suit, even though everybody might care and everybody might be offended at some level by the pollution that's in violation of the law. It's the same here. Everybody would like the elections to be conducted lawfully and in compliance with federal law, including the voters. But the injury is visited more specifically on the candidate. They're the ones that even though the voter says my vote is diluted by all of these other unlawful votes. Right. Don't they have the same kind of injury you're talking about by extra votes that come in? I mean, ironically, the petitioners here tried to make a voting standing argument below as well, and that was rejected. And we didn't really shouldn't this one be rejected. No, no. And what I would say is that the candidates different his or her names on the ballot right there. That just tells you there's something just obviously different about it. But then the other thing is, you know, I think the reason that in a case like Lance, you're worried about voter standing is because there are almost as many voters as taxpayers. Can you speak to the pocketbook injury? Yes, I'd be delighted to. So on the pocketbook injury, I do think it is a mistake to think that and this is really, you know, Judge Scudder's dissent handled this issue quite well, I think. And I think it really gets down to the issue of is this like Clapper? And when it's when when the injury itself isn't speculative, but the government is going to do something and it is going to happen, late arriving ballots will be counted at that point. The only remaining question is the expenditure of resources reasonable. Yes, but the harm in Clapper wasn't imminent because the rule wouldn't necessarily apply here. The harm isn't imminent because even though the rule will apply, he may not lose as a result. There's still not a risk of him losing, even though this rule applies to him. They're indistinguishable in that way. With respect, I think the reason the injury was so speculative in Clapper is because the rule would never apply to the petitioners, the U.S. citizens. It was a moral certainty. It wasn't going to apply directly to them. And then it was entirely speculative as to whether it would implicate their foreign clients at all. Here, what is prompting us to spend money is going to happen. Illinois will count late arriving ballots. But if you're a 98 percent candidate, what difference does that make? I mean, it only harms you if you could lose as a result of the new ballots being counted. So with respect, as a practical matter, the 98 percent candidates not going to bring the case. But the 70 percent candidate, the 60 percent candidate, the 56 percent candidate or even the 43 percent candidate might bring the case. And those margins of difference make a difference. And the whole election system operates on the premise that we care about more than the binary final outcome. Thank you. Thank you, counsel. Mr. Talent. Mr. Chief Justice, and may it please the court. Candidates have standing to challenge laws governing the validity of ballots cast in their election. So long as there is a risk that the ballots at issue could affect the election's outcome for two, but only two reasons. First, the risk of loss suffices because candidates are not mere bystanders to ballot counting laws. Those laws determine which candidate wins his race. They are aimed at candidates' concrete interest in winning office. And so the question, what's it to you, answers itself. Second, candidates have standing based on reasonable costs they incur to mitigate the risk posed by ballot counting rules. This narrow rule resolves this case and comports with basic tenets of election law by ensuring that the validity of ballot counting rules can be determined well and well in advance of an election. Furthermore, it does not require courts to prognosticate about whether a race will be close or effectively limit standing to major parties. I welcome the court's questions. Would there be a difference if the race is a tight race? Because it seems as though the problem we're having here is that there's an argument that there was no risk that this candidate would lose. Justice Thomas, we do not think it would matter if it's a tight race. If a candidate in this scenario, the candidate is a direct object of the ballot counting rules. And what this court's precedents teach is that when a candidate is a direct object, a small probability of risk is deemed to be is deemed to be a substantial risk. And the example we use in our brief is the example of a Russian roulette hypothetical. Even if the risk that the round in the chamber is live, the very fact that in that context, that the direct object of the of the game is being forced to engage in that game means he has a concrete interest, means he has standing to prevent that risk from happening. Well, when you put it that way, it seems to me that you are kind of buying into the what risk does the candidate really have? I mean, in Russian roulette, you've got a one out of six or whatever it is risk. But if you're looking at risk and it's, you know, 85 percent margin of victory, I mean, is that your argument? Our argument is that the substantial risk test in this court's precedents goes to the question of whether a risk is speculative or not. So in the context of ballot counting laws, we know that the law is going to be applied to the candidate. We know that the law's purpose is to determine which candidate wins. So it's targeting the candidate's concrete interest in when he's winning his election. And so therefore, there is an actual risk that those ballots could sway the outcome of the election. And what if there I mean, what if there isn't such a risk? You know, he's won 10 elections in a row by 85 percent. Maybe you can even tell from the turnout before the mail mail mailing in. I mean, does that make a difference under your theory? It would not make a difference. Chief Justice Roberts, the we pull this test. It comes from this this court's pre enforcement standing context. In that context, this court is deemed a risk to be substantial, even if there is something like a credible threat of enforcement or if the threat of enforcement is not imaginary or wholly speculative. The court's never put a probability threshold on the. But I would say in my hypothetical, none of those adjectives fit it. There isn't a credible threat that the guy is going to lose. But it's still I mean, it's part of the part of the issue is past results don't guarantee future outcomes. So even in the Russian roulette hypothetical, even if it's a one in 100 chance, the fact of the matter is a person is forced to engage in that gamble and the concrete interest in the what's it to you answer is avoiding the gamble that implicates that person's concrete risk. A candidate is in a similar situation because ex ante, this ballot county rules force them to take the risk that those ballots will sway the outcome of their election. Can you I'm sorry you're done. Can you address from the government's perspective if there isn't standing for these kinds of challenges to ballot receipt deadlines for U.S. House elections and they're standing pre-election and they're all forced post-election what it looks like next November or December? I mean, I think it's opening it's every it's all the concerns Mr. Clement raised. There's going to be these if there needs to be a likelihood or if the test is the ballots actually did make a difference, it's going to force a lot of it's going to force this litigation into the post-election context. It's going to require and it's going to force it into the post-election context for hotly contested cases and will have, I think, the practical effect of ensuring that only major parties would be able to sue to vindicate to protect their interest against unlawfully counted ballots. And if the deadlines were found to be unlawful, what would you have you thought ahead to what the remedy would be in a post-election context if the deadlines were found to be unlawful, how that would play out? Because if we're not thinking ahead to that, we're going to walk into something. I mean, I can't I can't imagine it be easy or good to determine all the things I think you talked about with Petitioner, questions about remedy, questions about whether voters are going to be disenfranchised because they relied on rules of the road. It's simply a it's a it's a thicket that the court doesn't need to get into if it recognizes that candidates are direct objects of these regulations. And what this court's precedents indicate is that when a candidate is or when a plaintiff is a direct object of the regulation and the harm immediately flows from the challenge being conduct being challenged, then that is a substantial risk of harm. I might quibble with the direct and just and direct or analogous to an object. The indefinite article. Yes. You your entire presentation, as did Mr. Clement, takes out our regular articulation of standing in Meese versus Keene. We said the candidate has standing when the defendant's conduct would substantially harm his chances for reelection. We in Clapper, we said substantial risk of harm in Murphy. We said substantial risk that in the near future, the plaintiff will suffer an injury. Both of you are sort of ignoring that language because you're saying you're almost arguing in a circle. It's always a substantial risk because it might happen, which is plausibility is never what we've accepted. Maybe Justice Kagan is right. Let's talk about what the electoral disadvantage is here. What do you see if we use something like that accounts for the cases that Mr. Clement argued, like whether or not I will have to pay a greater amount or accept a lesser amount? That's electoral disadvantage. Someone else might pay less and I might pay more. But where's the electoral disadvantage here? So meaning all the voters, Democrat and Republicans, get the same chance to have their vote counted. So it's not a harm to either side that the people voting for them are going to be equally treated. So I just want to push back on the premise. We're not saying just because a risk may happen, there's a substantial risk. The plaintiff has to be a direct object and the harm has to immediately flow. Back to is he or she the direct object? So we're going to have to now change our standing to say indirect objects or people who are part of the scheme in any way. But even in Diamond, the fuel manufacturers were not part of the regulatory scheme. But in the electoral context, and I think the electoral context is in especially rules governing the validity of ballots, is unique in this sense because the purpose of those rules, almost the only purpose for a rule saying this ballot counts, but this ballot doesn't, is to determine which candidate wins the election. So it is targeting the candidate's confidence. Can you answer the question, what's the electoral disadvantage in this case, given the allegations of the complaint? Let's deal with that. What can you show me in the complaint that articulates electoral disadvantage? So our rule doesn't turn on electoral disadvantage, partly because vote counting rules ex ante, it's impossible to know which way they will break or often it's unknown which way they will break. So Vistalito said you could, you could have a long history of, you have proof since 2005 of where these things have broken and you could have alleged that. Our rule is not, our rule doesn't exclude standing based on electoral advantage. I think one of the things our rule gets at to the extent electoral advantage feeds into our rule, part of the gamble, so two answers, part of the gamble or part of the reason is a concrete particularized harm to candidates is if they don't expend resources to mitigate the cost of, of this substantial risk, then they are giving up potential and electoral disadvantage. Thank you counsel. Thank you. Justice Thomas. Justice Vistalito. How would candidates for very minor parties fare under your rule where they have no chance whatsoever of winning? Because they're direct objects and the harm immediately flows to them, they would have standing. Thank you. And Justice Sotomayor, Justice Kagan. Mr. Talent, I have a sense that this whole suit is a little bit of a, it's like in search of a problem. I mean, in fact, we all the time allow suits pre-election to challenge election rules. I mean, there's hardly an election rule that gets passed in any battleground state that isn't challenged. It's usually by a party and we've, you know, I think always allowed those kinds of suits because the party has suggested in plain English and it's not so hard to do why it is that the new rule will harm them. Why it is that, you know, they'll, they would prefer the old rules in terms of their electoral status. So why isn't the same thing true here? I mean, I guess I just sort of think like, what's the problem here? The problem here and what our rule gets to is the fact that candidates are forced to gamble that these ballots are going to affect the outcome of their, their election. I don't think we've ever actually asked the RNC or the DNC to do anything like that. What we've asked the parties to do is to, and this is why you don't get these cases thrown out on standing grounds because there are perfectly easy ways for a party to say why a new rule is going to harm them in the electoral game. You know, when, when Sunday ballot, when Sunday voting is shut down, the Democratic Party rolls into court and says, this is going to harm us and the suit goes forward. And similarly for the Republican side on different kinds of rules. I mean, I feel as though we're asking to create a whole new set of rules when everything has been proceeding just fine, that everybody who actually is harmed or is likely going to be harmed by a new election rule has had the chance to sue. So we, we, our rule addresses a situation where a candidate is coming in and ex ante, they're being forced to gamble on whether or not... All of these suits are ex ante. I mean, every time we have an election, I mean, every battleground state we get, we get to see how litigation plays out, mostly brought by the RNC and the DNC prior to the election, asserting that a new rule is invalid for some reason or other. And those suits are never tossed because of stand-in, because, because there are easy assertions to make in a complaint about why a new rule is going to hurt you in the electoral process. I think a candidate can make those allegations here with a, with a, based on the fact that these, these rules govern the counting of votes in their election. They're forced to gamble that these rules are not going to affect the outcome. So whether, you know, the, as to the competitive injury, just to kind of make an example, you know, even though that may benefit them, they still have to put on the line, their concrete risk at winning because they may not benefit them. It's different for the RNC and DNC because I don't think they as neatly fit into the paradigm of, of being a direct object of these rules. It's really the candidates. Thank you. These rules are targeted at their electoral success. Justice Gorsuch? Justice Kavanaugh? Just, are you not seeing a candidate different from a party, I gather? I think we are. A candidate is definitely a direct object of a, of, of a rule governing the counting of ballots in an election. Well, I guess you're saying then if a party has standing, I'm for sure a candidate should have standing for similar reasons. Is that what you're saying in response to Justice Kagan? What I'm saying in response to Justice Kagan is that the reason we need the narrow rule we have now is to deal with candidates. We want to challenge these rules. In this case, the RNC, for whatever reason, did not become a party plaintiff. But the reason a candidate has standing in this context is because they are a direct object and because they're forced to take that gamble. Whether the RNC comes in and alleges competitive standing, that may be a separate theory of standing in that case. But in this case, the reason really is the candidate is being forced to gamble that the rule is not going to cost him his election. Thank you. Eric, Mrs. Jackson? I guess I don't understand the gamble harm theory at all. I mean, in every election there, candidates, candidates voluntarily put themselves up for election and there's a risk that they will win or lose, right? Yes, but the gamble here is that an un, an allegedly unlawful law is going to put put at risk their odds of winning or losing. They have, they have. Why don't they have to establish as a part of that harm that they actually have a risk of winning or losing or losing as a result of this? That's the part that your rule sort of said, so long as there's a risk that the extra ballots could make a difference. And I said, aha, OK, that's exactly what we're saying needs to be established. And yet you're saying, no, it doesn't. If you're a direct object of the regulation. So you've sort of taken away the very thing that you are now saying is necessary to show harm in this situation. Well, so two answers is that on the doctrinal answer is that when they, when it plaintiff is a direct object of the harm, like in the pre-enforcement cases, this court hasn't required them to meet some type of strict probability threshold. It's a fact that there is a threat of harm that immediately flows from the challenge conduct. In the context of elections, it may not be possible to know how a rule will affect the outcome of the race. So our rule, this harm, our rule harmonizes or comports with the basic tenet of election law, which is you don't want to, we don't have to, you're saying we don't have to assess the realistic nature of the plausibility of the threat. I'm saying that in any particular candidate situation, we don't have to care that there really isn't a risk for the 98 percent candidate. We still just the theory, the fact that there could be for some candidates, the ability to lose as a result of this is enough to give the 98 percent candidate. It's a factor that it's, it's that Russian roulette hypothetical. Got it. Thank you. Thank you. Counsel is a nurse. Mr. Chief justice and may it please the court rather than address the record, the parties developed below petitioners first argue that candidates always have standing to challenge the rules that govern their elections because any election rule can cause a single vote change in the final tally. Petitioners blanket candidate standing rule would cause chaos for election officials while saddling federal courts with resolving abstract policy disputes. This court should hold candidates to the same standing requirements as every other plaintiff. And when those requirements are applied to this record, congressman boss doesn't come close to showing standing. His invocation of the possibility of a reduced margin of victory fails at the start as the United States put it in its brief boss desire to run up the score is not a concrete injury that history and tradition shows can support standing to sue and petitioners reliance on harms that are legally cognizable. There's no better petitioners repeatedly told the seventh circuit that boss is not at risk of losing an election and this concession to one side in his declaration boss use the words if and may without any explanation when referring to the possibility of an election loss or reputational harm. These conclusory and incomplete statements describe the near theoretical possibility of injury. They are not evidence of a substantial risk of harm. Finally, as for petitioners pocketbook theory, while the cost of precautions may be an article three injury, this court has recognized standing on this theory only when the underlying harm sought to be avoided is itself legally cognizable. Any other rule would water down article three's requirements in cases alleging future injury and because petitioners identified no legally cognizable future harm, their efforts to repackage that failed theory into a present injury theory should be rejected. I welcome the court's questions. How close would an election have to be in order for there to be a sufficient substantial risk of harm? Sure. I think it's always it would always be easier in cases where elections are close. But I would also point out that this court has never attached a metric to substantial harm and I don't think the court needs to do so in this case because I think under any metric the assertions in this declaration fail because they don't show any risk of harm at all. They simply describe the mere theoretical possibility of harm. And this court has said in cases like Summers that standing is not an exercise in what is merely conceivable. It requires a showing of substantial risk of harm and the burden is on. I'm sorry. Look, what you're sketching out for us is a potential disaster. In other words, you're saying if the candidate is going to win by 65 percent, no standing. But if the candidate, you know, hopes to win by a dozen votes and there are places in the country where that happens over and over again, then he has standing. But we're not going to know that until we get very close to the election. Right. And so it's going to be in the middle, the most fraught time for the court to get involved in electoral politics. That's when you say we should jump in as opposed to the more general broad rule. Mr. Clement's broadest rule, I guess, is look, he's a candidate. He's challenging a rule in the election. Isn't isn't that enough? And one reason, as I say, we'll be deciding that case then, you know, six months, nine months, maybe two years before the election, as opposed to the day after the votes have been counted. So I don't think that is an accurate description of our position for a couple of reasons. I don't think that there is a concern that standing will only be available right before an election and only in close cases. And that's for two reasons. The first is that the evidence that a candidate plaintiff could use to show standing isn't simply sort of limited to polling data. I think Nice versus Keene is very helpful on this point. In Nice versus Keene, the court described two types of information that the candidate used to establish standing. One was polling data. One was the expertise of a political advisor. But I don't even think that those things are necessary in a case like this one where we are dealing with a very experienced and successful candidate. Congressman Bosch has been successfully running for election for 30 years. At the time, you know, when they when you run for election for 30 years and win, sometimes, you know, you get you you act as if you have no risk of losing and you know what happens then you lose a candidate who acts as if there's no risk of losing often often loses. I don't know. And then you'd say rely on polling data or polls always reliable. My point is simply that in response to the chief justice's question, I think that there's a lot of information Congressman Bosch could have brought to the table. I don't think it's limited to polling data. Respectfully, bring the table. OK, so we bring to the table polling data that shows you're down 20 candidates are down 20, sometimes make late late breaks for it. And when happens all the time and you said expertise of campaign advisors. I respect them as much as anyone, but they can be wrong and they don't have perfect crystal balls either. I don't understand a standing rule that therefore depends on prognostication is my only point. And so you can respond to that as you think best. Thank you, Your Honor. I think that in any standing case where a plaintiff is alleging future injury, courts are required to make some sort of prediction now. But of course, the prediction is a substantial risk of harm. It's not certainty of harm. And my point is merely that there is a lot of information that was available to Congressman Bosch. He wouldn't even need to turn to the type of information that the court credited in Meese versus Keene. He could have relied on, you know, that eight election cycles that he had participated. Well, there was a lot of there was a lot of information for, you know, Tom Dewey and Charles Evans Hughes. And, you know, they both went to bed thinking they were president. And it just seems to me that the ability to predict has is is not has not been proven to be infallible. And yet you're going to tell somebody two weeks before the election, no, you won last time, you're by whatever margin. What margin are you looking for? Higher races, he won by what? And then that's enough to get standing. So, again, this court has not attached a metric. It uses the substantial risk test across the mine run of standing cases. It has never attached a metric. What it has said is that you look, you know, the burden is on the plaintiff and you look at the facts and the record, which is why I called the court's attention to the declaration. Well, that's right. But it depends on what sort of things you're talking about, the risk that the car is going to explode or whatever. But if it's a risk of elections and all that counts is the the number you get, it does seem to me that it would fall upon the courts to give some idea. Again, I do think that when he submitted this declaration, he had successfully participated in eight election cycles under the ballot receipt deadline. This last year, you keep going back to the facts of this case. I appreciate appreciate why I would, too. But I think what the chief justice is getting at and what would help me certainly is OK, if a probability of loss needs to be shown to secure standing, what's that probability? Is it 50 percent? Is it 60 percent? You've resisted giving us a number and I would just ask you if you could what you think that threshold should be. And then along the way, is there something unseemly about federal courts making prognostications about a candidate's chance of success immediately before an election that itself might influence the election? Yes. So I hear maybe two questions in there and I am resisting giving a number because that is consistent with this court's cases. The court has said so. No number. You're not going to give us a number. How about the second part of the question? Sure. And maybe could you repeat that for what is there something unseemly about a federal court in the middle of an election saying you don't have standing because you're going to win or you do have standing because you might lose and that that itself might influence the electoral process. So, again, I don't I think it is common across all of the court's cases. We're just asking for. I'm talking about in this context and I'm sorry to interrupt in the election context. Is there something particularly and potentially unseemly about that or are you not concerned about that? I don't think it's more unseemly than in other cases where a plaintiff seeks to establish standing based on a substantial risk of a future. I mean, I just want to run a couple of hypotheticals by if I might before I let you go and I'll let you go quickly, I promise. But imagine a law like the one in Janice or Illinois, socialist workers where state requires a lot of signatures to get on the ballot. Minor party candidate has no chance of winning. Standing, I mean, yes, because in that case, as I hear it described, a direct regulation of the candidate and this court has long distinguished decades of work to the probability of success in those kinds of cases, have we? No, no, the court has not. It's in cases like this one where the challenged law doesn't directly regulate the plaintiff. It regulates third parties. And in cases like these, the court has held that the plaintiff needs to show a substantial risk. So let's take an example that meets that. I think, say, the election officials decide to count only 100 votes from each precinct and declare the winner based on that. And assume the candidates don't know which side that random sample will benefit. Standing doesn't regulate them directly. It's just a rule about counting ballots. So as I understand the hypothetical, the election authority has announced in advance they're only going to count a small number of ballots. They're going to just disregard all the other ones. So I think actually when in Meese versus Keene, the court, in addition to talking about the loss of an election as a cognizable harm for candidates, also talked about damage to the candidate's reputation in the community. And I think the circumstance you're describing, like a pre-election announcement that we are just not going to count all the ballots, is the type of extreme circumstance where a candidate could say, if I win in that circumstance, my victory is completely illegitimate. Well, why? Or say we're going to count ballots for three months after the election, and you don't know who that's going to benefit. I can't prove that I'm going to win or lose. Or I'm going to count for a year. Standing? So I mean, that probably would kind of run into other Illinois laws and federal laws. Oh, well, that's the allegation here is that this runs into other laws, the practice here. And so I'm giving you other examples, undercounting, overcounting, whatever, however you want to phrase it, in which you don't know how it's going to affect the candidate. But, you know, it one wonders. So I do think in that type of circumstance, to me, that probably isn't the type of extreme circumstance where a candidate could claim, you know, reputational harm. Thank you. I mean, you're referring to reputational harm. I'm trying to figure out what's the reputational harm that distinguishes the sampling hypothetical that Justice Gorsuch asks from this case, where the allegation is that illegally cast ballots will be counted. How's that different? So to me, there's a distinction between a situation where a candidate could perhaps plausibly allege that even if he were elected, you know, under this process, the election would be so illegitimate that nobody would credit him as the successful candidate. And I don't think this circumstance meets that standard because, of course, Candidate Blast has successfully run for election now 10 times under the ballot receipt deadline. And I don't understand him ever to have suggested that he somehow was illegitimately elected. And the reputational harm component, I do think, comes from Meese v. Keene, which is a candidate standing case in which the court described, you know, two types of injuries a candidate could have. And one was the risk of an election loss. And the other was the possibility of, you know, adverse impact on their reputation in the community. I don't want to create a bespoke standing rule. However, this case involves the question of injury in a particular context, which is different from other contexts, and that is injury in a competition. So along those lines, let me give you a hypothetical. Suppose that eight runners qualify for the U.S. finals to go to the Olympics in the 100 meter dash. And when they show up for the competition, they find that actually they're going to have to run 105 meters. Does anybody have, can any of them show injury, in fact? So I think in that circumstance, you know, if this court were, you know, to apply the competitive standing cases, the court would, you know, ask, was, you know, any potential plaintiff as compared to a direct competitor, were they substantially disadvantaged by that? And so, yes, they would need to show some sort of harm. So they would have to, an individual runner would have to show videotapes of other races and show, I start to lose steam at the, you know, the 97th meter. So making me go 105 yards is going to hurt me in relation to others. I mean, I think the standard is one of plausibility, and I don't know that one would need to present that type of evidence to make the assertion plausible. Are any of them going to be able to challenge this? I think actually it probably could be fairly easy to challenge. If they could, they could say, I mean, presumably I could imagine a plausible assertion that, you know, I have, you know, trained for 100 meter race and 105 meter race makes some sort of difference that puts me at a substantial disadvantage. But I guess I, you know, and I know the court is resisting going back to the declaration, but standing cases are fact specific. Well, this is in this specific situation, what would be wrong with a rule that says for competitors in a competition where there's going to be a winner and there's going to be one or more losers when the rules of competition are changed in a way that produces a risk that can't readily be measured, then all the competitors have standing. So doesn't that make sense? So I don't think that it makes sense to adopt a blanket standing rule for candidates because I think it would create two problems. First, it would create chaos for election officials. It is very easy to be a candidate. Any self-declared candidate could challenge any election rule that they happen to have a policy disagreement with, even if that rule were entirely harmless. And election officials who are tasked with actually running elections would have to divert their time and energy and litigate, you know, these policy based disputes. And then federal courts, in turn, would be put in the position of resolving these, you know, disputes, which is exactly what this court's standing cases have dictated should not happen. Suppose that there was some change in rule that had a very high probability of cutting into a candidate's vote total by a fairly small amount. So let's say very high probability that this will cut into your vote total by 2 percent. Standing? So I think in that case, the candidate would have to be able to plausibly allege that that sort of 2 percent change in the margin harms him in some way. So that seems that seems not right to me that, you know, then you're going to force people to come into court and show a bunch of polls and how that 2 percent margin might or might not make a difference in the end when what you have is quite clear. What you have is a voting rule that harms somebody relative to what's come before. And that is a usual standing inquiry. And, you know, it's not a bespoke anything. It's like this is a new rule. It's going to harm me relative to what's come before. I have a right to complain about it. Why isn't just that's enough? I actually don't think we would have any problem at all with that rule. I think the problem is, is that Congressman Bost can't show standing based on that rule, because then I would go back to the declaration. He could show standing. Whether he did show standing is another thing entirely right. That this is a is a complaint that sort of seems a little bit to be created in order to I don't have to show injury at all theory, but but it would be very easy for Congressman Bost to write a complaint that satisfied my rule. I mean, I don't disagree with you, and I guess maybe appreciate you sort of re appropriately reframing. My point is that what he wrote at page 68 and 69 of his declaration does not satisfy that rule, because when asked about electoral law, he used the word if that's a mere theoretical possibility of harm. He provides no explanation why he thinks he plausibly could lose his election. And when asked about a diminished margin of victory, he uses the word may, which suffers from the same problem. He had a wealth of information available to him. I know I keep going back to the fact that he's an experienced candidate, but it matters. He had lived through at the time he prepared this declaration, eight elections under the ballot receipt deadline. He said in his declaration, I send poll watchers every single time. So he would have known at the end of the day on Election Day how many votes were cast. And you're saying to me, you know, I think that what you're saying to me is a little bit different than from what you said to the chief justice, because what you're because I agree with the chief justice. You do not want candidates to have to walk into federal court and show that they're, you know, they're up in the polls by X amount or that they've won the last five elections by X amount. You're just saying he doesn't say anything to show that he's going to be harmed at all by the new rule. That's exactly our position. And, you know, the burden is on the plaintiff and standing is fact specific. And you look at the record that you're walking away from a lot of your brief there. You're walking away from most of your brief with that answer, which is that's your choice. You've mentioned the word chaos a few times. I guess I'm worried about the chaos of post-election litigation and how that would play out in a circumstance like a challenge to this particular ballot counting rule. In particular, let's suppose post-election challenge, therefore, no real issue of standing in a real close election and the rule is found invalid. You thought about what the remedy would be in that circumstance? So I presumably comes to this court and maybe that house elections ride on it. So we know we know which way we rule, what the impact will be, which is never a good position. So I guess I would push back on the idea that there it necessarily would have to be resolved post-election. I'd go back to the point. It's only substantial risk. There is no need for certainty. He would simply, you know, have to show a substantial risk of some legally cognizable harm that could include losing the election. It could also, according to me, you know, include, you know, harms that rise to the level of a reputational harm. I don't. I'm sorry. I just wanted to point the court's attention, as the court is probably aware, to the Watson case out of the Fifth Circuit that challenges a very similar law. You know, in that case, the political party was found to have standing. It did include, you know, different allegations, better allegations. So, for example, it included an allegation that if Mississippi's ballot receipt deadline was enforced, that would impair the party's ability to elect their Republican candidates. So I do think that it is standing is not hard to establish. I just think that this candidate did not establish it based on these statements in the declaration. The two things I think you've relied on are how close the election might be. But you did say polling data earlier and candidate, expert candidates. And you've relied on how experienced the candidate is or how many terms. If a candidate's been elected twice, is the candidate in a better position for  polling? So, I mean, I think that candidate, I think that experience is relevant here just because Congressman Boss had so much personal knowledge about how the ballot receipt deadline works or doesn't work in his favor about, you know, what these later arriving ballots look like and whether they harm him or not. I think a newer candidate may not have that wealth of information, but they could certainly, I think, you know, rely on other information. And again, Nice talked about the experience of political advisers of polling. I really, I don't. Are you seriously arguing that whether or not the allegations here are sufficient requires an analysis of the particular background and experience of the candidate who files the complaint? No. This case would come out differently if this was somebody you've never run before. My point is simply that Congressman Boss had a lot of information available to him that he could have used to explain. He could have said, for example, you know, I've been through eight election cycles under this deadline. Well, then you are. I mean, then you are referring to the particulars of his situation. In any event, let me ask you about the pocketbook injury. Why isn't that straightforward? Mr. Clement says, look, it's it's political malpractice not to continue poll watching and related activities until the final bell actually tolls. That costs money. If you extend the period, it costs me more money. That's a pocketbook injury. And your answer is, well, he didn't have to spend that. Right. That's your answer. So, I mean, our answer is that when this court has found standing basically based on a expenditure of resources, that's his position. The court has required the plaintiff to demonstrate that that resource expenditure was undertaken to avoid a risk of harm that is itself legally cognizable. And I think that that rule makes good sense, because I think if the rule were otherwise, the plaintiff could simply take a failed future injury theory of harm where they couldn't show a substantial risk of harm. And you think the risk of losing the election is not legally cognizable? Well, of course, Congressman Boss has not established a substantial risk. He might lose an election. And in fact, he told the Seventh Circuit multiple times that he is not at risk of losing an election. I do think had he adequately established a substantial risk of losing an election, then certainly the pocketbook injury would be. So it turns on the risk of losing the election, not the risk of a less favorable result, less a smaller margin. I think it turns on a substantial risk of a legally cognizable harm. And I don't think that a diminished margin of victory in and of itself is a legally cognizable harm. We're talking about injury in fact. Isn't a smaller margin of victory an injury in fact? I don't think so, because unless it's coupled with something else, a smaller margin of victory has no real world consequences. It has no real world consequences? I mean, unless a candidate could. It makes no difference, but if you win by 50.0000000 percent versus 80 percent, it doesn't matter. A win is a win. I think under those circumstances, a candidate probably could plausibly establish that a diminished margin of victory has a reputational or other competitive consequence that matters. But I don't think that under circumstances where the change in the margin is a vote or a handful of votes, that that's a legally cognizable harm. And I think that's also consistent with the historical cases. I mean, if you look at the historical circumstances under which a candidate could obtain an election recount, those were always circumstances where the recount was likely to change the outcome. The question Justice Alito started with was monetary injury. And I thought that the likelihood of winning the election was really irrelevant to that. You have to hire staff for an extra two weeks and a good campaign is going to try to end up on election day with close to zero left in the bank to leave it all on the field. If you have to extend it two weeks, you're going to be reallocating your resources and potentially have to raise more money. But at a minimum, you have to spend more money, which is just obvious standing, isn't it? Without getting into all this other stuff, that's just obvious standing. You have to you have to spend more money to staff an extra two weeks. So so I don't think so. I think what this court's cases stand for, and this is cases like Clapper and Alliance versus Hippocratic Medicine, is the proposition that if a plaintiff is going to rely on the expenditure of resources to establish standing, the plaintiff needs to show that that expenditure was necessary to avoid a substantial risk of an injury that is itself legally cognizable. And I think that that makes sense, because I think that if the rule were otherwise, the requirements for showing standing on a future injury theory would be watered down. One follow up. I thought the test was, is it part of your core activities, your ordinary activities, if the expenditure is part of that? And I would think for a campaign as the amicus brief, the ACLU and the League of Women had a two political malpractice, not to not to be ready for that and to staff that. So I think that so petitioners here have not sort of proceeded under that organizational standing theory. But I think if you applied that theory here, we would still prevail because I think that Congressman Boss' core mission is to win elections. He's never told us that he has another. I mean, maybe some other candidate would have some other core mission, a minor party candidate's core mission might be, you know, to bring attention to his message, but because he's never proceeded under this theory. One more. Sorry, but spending money to get out the vote, monitor the polls, have staff that does all that, which is going to be necessary for an additional two weeks is just to be part of the campaign. I guess that that was my clarifying question, because with respect to this regulation, it's not the campaign that is extended for two weeks. Is that correct? I mean, I understood what is happening. This regulation is just the counting of the votes that have been postponed, that come in postmarked, but the campaign is not continuing. Right. So, I mean, all this regulation means and it doesn't even actually extend the time period for counting votes because we would be the state would be counting provisional ballots during that for 14 days. There's already something going on. So the costs are really reduced. I mean, as I understand this regulation, what is happening is that the state has decided that it's going to count ballots that it receives in the mail that are postmarked as of Election Day for the next two weeks. So really, what is the expenditure that is happening here? I guess Mr. Boss is saying I have to have people to continue to monitor the counting. But you say counting is happening anyway because of the provisional ballots. So I don't understand this great big cost that is suddenly happening. I mean, I mean, I don't mean to fight the question. That's probably a question for the congressman. I mean, we did, you know, for purposes of this point in the proceeding, you know, take at his word that he has, you know, engaged, you know, additional resources to engage in further in monitoring the counting. But I do agree with your honors observation that the time period for the counting is not extended at all. And if I could, I see I'm short on time, but I'd like to, you know, briefly address, I think Justice Kavanaugh, you know, raised the legal malpractice point, that sort of colorful phrase. I do think that Clapper is helpful on this point because in Clapper, you know, there was no question that the lawyers there had diverted resources. They were traveling overseas to meet with their clients and they were doing that because they wanted to avoid the risk of unlawful surveillance associated with the challenged federal law. I don't think there was any question that those decisions were reasonable because if you look at the Second Circuit's decision, there was an affidavit submitted by a legal ethicist and the ethicist explained that if the lawyers didn't take precautions like these, they actually would be violating their duties as attorneys, essentially committing. Justice Thomas, Justice Alito. Do you think that monitoring the counting of paper ballots is either not important or doesn't require the expenditure of resources? No, that's not our position. Of course, Congressman Bost is free to monitor countering, you know, counting, you know, consistent with Illinois law. Our position is simply that when a plaintiff has seeks to establish standing based on a resource expenditure theory, the question isn't whether that decision was reasonable. The question isn't whether it was prudent. The question is whether were those resources expended to avoid a substantial risk of harm that is itself legally cognizable. And as I mentioned, I think the rule makes sense because if the rule were otherwise, a plaintiff could simply take a failed future injury theory of standing where they couldn't show a substantial risk of harm and repackage it as a present injury theory of standing based on resource expenditures. Thank you. Justice O'Neill, Justice King, Justice Gorsuch. Just one question. Justice Scalia once wrote, and I know you're going to say that this case doesn't implicate this, but I just want to understand if you agree with the principle that he said, which was count first and rule upon legality afterwards is not a recipe for producing election results that have the public acceptance democratic stability requires, end quote. Do you agree with that? I think, theoretically, I think it makes sense, you know, not to, if I understood the statement, I think that post-election challenges are probably not ideal. Did I understand the statement correctly? But I don't think that our position, which again, is how the court treats standing across all cases requires that because the test is simply substantial risk and Congressman Voss declaration simply doesn't show substantial risk by any metric. Thank you. I'm a little bit worried about your concession to Justice Kagan, that you'd be okay with a rule that says that if the, if it harms the challenge, regulation harms someone relative to what had come before, that would be enough. And the reason I think is because that would implicate situations like even the one Justice Kagan posited, which is a person who has lost the election significantly, but who claims something about the two week period would change their margin or lost or won, say, change their margin, would be harmed by that. And I guess I don't understand that. It seems to me that it might, that the extra counting of balance might change your position, but it only harms you if it would make a difference in the election. And I thought that was your bottom line. I thought it was sort of what the government would say, the SG was saying a little bit, but it seems to me crucial to uphold this idea that harm is required for standing purposes. And I worry a little bit practically, if we accept that kind of thought, the idea that a candidate is harmed if their margin of error changes, even if it doesn't make a difference in the election, that we're actually opening up avenues for a lot of election challenges that we wouldn't otherwise have. People who have lost the election, but they want their margin of defeat to be different or they think it might have been. And so now we have litigation over the counting as a result of that. Can you respond? I appreciate the question. Thank you. I certainly did not mean to suggest, if I did, that a diminished margin of victory by itself, in our view, is a legally cognizable harm. So maybe it would kind of be helpful just to describe what we think are legally cognizable harms for candidates. And I think they come from history and I think they come from Meese versus Keene. The easy one is the risk, the substantial risk of losing an election. Then there are other concrete electoral consequences that are probably more available to minority party candidates. But that would be like a substantial risk of not getting on the ballot or a substantial risk of not qualifying for public funding or maybe sort of other fundraising injuries. And then there is the statement in Meese versus Keene, which talks about reputational harms. And I think that in extreme circumstances, a candidate could plausibly allege in advance of an election that even if I win, I know I'm going to win. Even if I win under this election scheme, my victory will be so illegitimate that my So to summarize, those are the kinds of harms that Justice Kagan says have been routinely alleged and courts have accepted and are pretty easy to make. And so then you get on the then you go on with your lawsuit. Right. Yes. Thank you. Thank you. Thank you, counsel. Rebuttal, Mr. Clement. Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, I just want to make the point that I don't think you should just contract all this out to the RNC and the DNC. There are cases where the RNC has lost on standing on page 16 of our petition, RNC against Burgess is one. But I also don't think you want to put the candidate in the position that they have to convince the National Committee to support their challenge if they actually think they're being harmed either by the pocketbook or their electoral prospects or that unlawful ballots are going to be counted. Second, I think it's important when you look at this complaint and people are complaining about the threadbare nature of the complaint. Keep in mind, one of the things that is in the complaint and this is at 85 of the petition appendix is the state's own statement before the previous election that said, hey, reporters, don't get too excited about election day results because the late arriving ballots can change the results. So stay tuned, essentially, for 14 days. Now, the state didn't say, oh, but don't worry about Congressman Bost's district. That one's different. That's a state seat. And of course, the state would never say that because that would put state election officials in a ridiculous position of before the election deciding that certain seats are safe seats and certain states or seats are toss ups. But yet the state wants to put the federal courts in the same position. They want you to look at this declaration and say, well, you know, he's a 10 time incumbent, so he's got a higher standard of showing how these ballots are going to hurt him. Or maybe it's easier for different for a different incumbent. That way lies madness with all due respect. I mean, they're asking for essentially an Article three determination that Congressman Bost is in a safe seat. And the Article three equivalent of the Cook report seems like something that should be avoided at all costs. Now, let me just finish on one point, which is part of the debate here is who's asking for a special rule of standing. And with respect, I think it's the state that's asking for a special rule of standing to the effect that only an electoral disadvantage that can threaten your win or loss at the end of the day counts. And maybe some stuff that I'm frankly confused about about nice and one or two things. But it's really like you got to go in there and say this is going to be outcome determinative in the election. That is a special rule for elections. They say pocketbook injuries don't count in this context. That's not the law. I mean, if the government says to me, Clement, give me five hundred bucks, that's a pocketbook injury. I don't have to point to some other injury. That complements the pocketbook injury. Now, there are certain cases where there's a very speculative primary injury. And then this court has said, well, you can't spend yourself in standing. But that's not this case. It's perfectly reasonable to spend this money on these poll watching political malpractice not to do it. Let me finish with one thought is seems like we have three different tests here, three different theories, but they all come down to a simple common sense proposition. A candidate is not a bystander in his or her own election. Their name's on the ballot. They put their lives on hold so they have a special interest in what's on the ballot. Thank you. Thank you, counsel. The case is submitted.